MARY BLACK, Jane Ball, and Mary Jane Cunningham, Respondents, v. VERA HELEN SMITH and Jay Brand, Appellants.

(224 N. W. 915.)

Opinion filed January 19, 1929.  Rehearing denied April 23, 1929.

*H. P. Thomson* and *George A. Bangs,* for appellants.

*H. C. De Puy* and *H. B. Spiller,* for respondents.

BIRDZELL, J. This is an appeal from an order of the district court of Pembina county denying motions for a judgment notwithstanding the verdict and for a new trial in a will contest proceeding. In response to a petition for the probate of the will of William Cain, deceased, the judge of the county court of Pembina county overruled objections of the contestants and admitted the document in question to probate as the last will and testament of the deceased. An appeal was taken to the district court from the order and decree to that effect, where the matter was tried anew before the judge and a jury, the jury finding the issues in favor of the contestants. The principal issues raised in the amended objections to the probate are that the document was not executed, published, or attested in the manner required by law; that the deceased was not of sound and disposing mind nor competent to make a will; that the pretended will was not freely or voluntarily made, subscribed and published by him; that it was secured by the duress, fraud and undue influence of the beneficiaries and others acting in conjunction with them.

The document in question, after directing the payment of debts and funeral expenses, contains three bequests as follows: To a friend and neighbor, Mrs. Elizabeth Waldo, the sum of $100, to Jay Brand, described as "my beloved nephew by marriage," $1,000; and a residuary bequest of all other property to Vera Helen Smith, described as "my beloved niece by marriage." It likewise contains a declaration to the effect that the deceased felt under no obligation to any of his other relatives and that he had therefore excluded them from receiving any of

his estate. Vera Helen Smith is designated as sole executrix to serve without bond.

The uncontroverted facts are, briefly, that the deceased, William Cain, and his wife, Maggie Cain, had come to the vicinity of Crystal, North Dakota, from Canada many years ago, leaving relatives in Canada, among them two sisters of the deceased, aged seventy-six and ninety years, respectively, who were living at the time of the execution of the document in question. The deceased and his wife had lived in Crystal and vicinity for many years. There was no issue of the marriage. They had been frugal and industrious and had accumulated some property. For twenty-nine years they had lived in the village of Crystal. Their property, aside from their home, was principally in the shape of certificates of deposit and in receiver's certificates representing deposits in banks that had closed. Though quite aged, the deceased being at the time in question approximately seventy-eight years old and Maggie, his wife, being from seven to ten years his senior, the couple lived alone in their home, and all of the indications are that their mutual affection was unusually strong. Living alone and having few interests beyond their mutual welfare, they had apparently developed some eccentricities. Among these was the habit of keeping the doors of their house locked so that no one, including even the most intimate friends and neighbors, was admitted without knocking and making his identity known. While some of the neighbors called with a greater or less degree of regularity, the couple lived much to themselves. About Friday, January 8, 1926, Mrs. Cain fell on the stairs leading from the combination dining and living room to the second floor. The injury or shock, combined with her age and a diseased condition of the heart and kidneys, resulted in her death at about nine o'clock A. M., Sunday, January 17, 1926. On the day before her death her husband fell on the same stairs and was likewise to some extent injured. On the morning of the death of Maggie Cain, Thomson, who was state's attorney of the county, came to the Cain residence as a substitute for the county judge who had been called but who was unable to come. After talking with a neighbor named Ginn, with Vera Helen Smith, Jay Brand and Dr. John Stacy, Thomson entered the room where William Cain was lying on a couch or cot, and the instrument in question was drawn and executed. William Cain died February 10, 1926.

Thomson testified he had gone from his home in Cavalier to Crystal on the morning in question in response to a call; that he and Dr. Stacy went from the residence of a neighbor, Thomas Ginn, to the home of William Cain; that they entered through the kitchen door and found four or five ladies standing in the kitchen. He there met Vera Helen Smith and Jay Brand. He did not talk to Mrs. Smith, but he did talk to Brand whom he had met in the Ginn home. He talked to Brand about his uncle and about what his uncle was going to do with his property and was informed that he wished to make a will by which he was going to remember Mrs. Smith and Brand. Brand did not know in what proportions, or what amount he was supposed to get. After meeting the ladies in the kitchen he went into the adjoining room or dining room, where William Cain was lying. Dr. Stacy was with him. Shortly afterwards the door between the kitchen and dining room was closed and nobody entered the room until after the will was drawn. The fact of Thomson's presence was announced to Cain who asked why McBride, the county judge, did not come—he expected him. It was explained that McBride could not come because of illness and Thomson had come in his place. Cain recognized Thomson and knew who he was; and after the explanation he signified it would be all right for him to proceed to fix up the affairs. Thomson sat on a chair alongside the couch. He inquired as to the nature of the property and Cain referred to money in the Grafton bank, St. Thomas bank and the First National Bank of Crystal. Thomson asked if he had any diamonds and Cain replied that he had. He referred to a certificate of deposit upstairs. He recited the contents or most of the contents of a $20,000 certificate of deposit in the First National Bank of Grafton, quoting it verbatim, and he spoke of deposits in other banks, naming them. He stated he wished to give the property to his niece, Mrs. Smith. Thomson asked if he wished to give any of his property to a number of different people and institutions, mentioning names, among them the name of Jay Brand. Cain said he would leave that to his niece. He spoke of Jay Brand, but he was going to leave the giving of the property wholly in the hands of Mrs. Smith. She could give Brand whatever she thought was right. Thomson advised that this would create embarrassment and that it would be better for him to make an outright gift, to which Cain agreed. Thomson suggested the amount be three or four or five thous-

and dollars. Cain replied "No, give him one thousand." Thomson mentioned the name of another nephew whom he knew named Black. Cain did not wish to give him anything. He asked as to remembering other relatives in Canada. Cain disclosed that Black's mother was still living and that there were other relatives in Canada. He stated that he did not feel under any obligations to them and that he would not give them anything. He would leave the giving to Vera. Thomson suggested Mrs. Waldo, stating that she had been a good friend and neighbor and asked if he did not desire to remember her, and he replied that it would probably be all right. Thomson suggested the amount of $500 and Cain said "No, give her one hundred." Thomson mentioned the churches. Cain stated that their church life had been unsatisfactory, mentioning the name of a preacher who had been there some years before. He did not wish to give anything to the church. Thomson suggested that the best way to give effect to his desires was to make a will and, to avoid expenses, to appoint Mrs. Smith executrix to serve without bond. Cain acquiesced. Thomson had brought with him a blank and he prepared the will while sitting on a chair alongside Cain who was reclining on the couch during all the conversation. He read the will over to Cain who said it was all right. He had difficulty signing the will owing to his physical illness. He appeared to be a weak old man. His hearing seemed good; his eyes, very bad. He attempted to sign first, but later, with Thomson's assistance, made his mark and with similar assistance wrote his name, Thomson guiding his hand. Thomson advised him of the necessity of having the will witnessed and Cain asked Dr. Stacy and Thomson to witness it, which was done in his presence and in the presence of each other, the will having been signed by Cain in the manner indicated in the presence of Stacy as well as Thomson. Once during the proceedings Thomson went to the kitchen to get the correct names of Mrs. Smith and Brand. Statements made by the deceased and answers given to questions asked were rationally made. On cross-examination Thomson stated he had been called to Crystal by two persons, Thomas Ginn and Judge McBride of the county court, the latter acting as a messenger for Ginn. He first went to the residence of Thomas Ginn, conversing there with Ginn and Brand and discussing Cain's property with Ginn, including the money in the bank and the diamonds. He was informed by Ginn that the property was to go to the

niece and nephew of Mrs. Cain, but Ginn did not give specific informa-
tion. Brand did not know what share his uncle was intending to give
him. Ginn and Cain had not been getting along well. Thomson knew
there had been no direct conversations between Cain and Ginn. Mrs.
Cain had died about nine o'clock in the morning. Thomson was there
between eleven and twelve. He took possession of the diamonds and
receiver's certificates. They were handed to him by the nurse who had
shown them to him upstairs. Cain was apparently very weak physical-
ly and impressed Thomson as being "a very feeble man." He visited
with Cain a while before transacting the business in question. The
situation was an unusual one. He did not talk with him about his wife's
death and Cain said nothing concerning it nor did anyone else in his
presence. Cain must have known that he was the owner of his wife's
property at that time. Thomson did not tell him. They did not talk
that over. Very quickly after starting to talk to Cain he said he wanted
his property to go to his niece, Mrs. Smith, and gave reasons. He said
he had confidence in her and she had been kind and good to him. He
stated that his sister, Mrs. Black, was living; he said nothing about a
sister Jane. His first intention was to give the property to Mrs. Smith,
but he made the bequests to Brand and Mrs. Waldo as a result of Thom-
son's suggestions followed by a conversation and Cain's agreement there-
to. Thomson knew that Mrs. Waldo was a good neighbor and was
helping. There were other neighbors there but he (Thomson) did not
know them so well. There would have been no legacy to Mrs. Waldo if
Thomson had not suggested it. Cain wanted Brand remembered, but
he was going to leave it to Mrs. Smith to use her discretion. Dr. Stacy
raised the deceased up to more or less of a sitting posture at the time
of the signing of the document and supported him. Thomson gave him
the pencil but he was unable to locate the proper place to write his name.
He attempted to do so but said his eyesight was poor. Some scribbling
marks on the paper were made by Cain unassisted. The cross desig-
nated as his mark and his name were written by Cain, Thomson hold-
ing his hand and guiding it.

This testimony in all substantial particulars was corroborated by
Dr. Stacy and is not disputed. There is a large volume of evidence in
the case which was introduced for the purpose of showing the condition
of the testator at the time of the execution of the will. It is impossible,

within an opinion of any reasonable length, to abstract this testimony. We, however, reproduce a bare outline of it, which will be sufficient to indicate the basis of our holding thereon.

Dr. Stacy testified that he considered Cain of sound mind. He had prescribed veronal for him during the week before, about the middle of the week. He thought it was Wednesday. He had given instructions to the nurse to give one or two capsules, giving one in the evening if the patient was not able to sleep and, if necessary, repeating it in two or three hours, or it might be one hour. They were either seven or seven and one-half grain capsules. He did not give Mrs. Smith any instructions. The nurse reported its administration and also the giving of morphine one night. He had not made a thorough examination, just a casual one; and was not sure as to taking pulse and temperature. He was then acting as physician for Mrs. Cain. He had not noticed anything indicating mental derangement on the part of Cain. He examined him on Saturday. He was then suffering from congestion of the lungs. He directed him to be placed in bed. He did not remember whether he was told that Cain had been put to bed on Saturday night or not. He was not prepared to give expert testimony as to the action of the veronal, as there would have to be some other financial arrangements made. Upon being required to answer, he testified that veronal is a hypnotic. It produces natural sleep in two or three hours. It is a safe hypnotic. He did not remember whether it produced sleep in one or two hours, and believed it was eliminated from the system through the kidneys. He could not give the percentage thus eliminated. Its effect is produced by action on the higher centers—those controlling thought and speech and other action. It does not dull the sensibilities. It produces natural sleep. The patient awakes refreshed and there are no bad after effects. The standard dose is seven grains, but a quantity up to fifteen grains can be given without any bad effects. There is such a thing as veronal poisoning. There are not many cases of veronal poisoning on record as it is always a large dose that produces it. He would not say that his study of veronal had been extensive; said he was not an authority on the question but could witness its effects and its freedom from bad effects even in large doses in the average individual. It is excreted fairly rapidly. It has no more cumulative effect than other drugs. He could not answer whether it remained in the sys-

tem as long as four days. Did not know of any effect upon the memory. He thought it did not cause impaired memory. He was sure it did not cause confusion of the mind. In determining whether Cain possessed testamentary capacity on Sunday, January 17th, he did not consider that the prescription of veronal and morphine would have any effect on his mind at that time. He had visited him professionally Sunday morning and again after the will was made.

On redirect examination, Dr. Stacy testified that he prescribed the veronal for him on Wednesday or Thursday because he was worrying about his wife and was not sleeping. Cain told the witness he had not slept for some nights. The witness knew of the giving of veronal only through the nurse. He did not remember whether the prescription was given on Wednesday or Thursday. Cain was an old man and could not afford to lose sleep. The nurse gave morphine according to his orders on Thursday or Friday, because the veronal was not producing sleep. It was given hypodermically. There was no sign of morphine or veronal when he gave Cain a fairly complete examination after the fall on Saturday. He saw no evidence of mental derangement.

A number of the neighbors of the Cains testified with reference to the failing condition of Cain's health, to the fact that he was growing to be quite forgetful; that on several occasions he admitted impairment of his memory. They testified to peculiar remarks he would make, indicating that he might have been laboring under some delusion or another; such, for instance, as "You know I am not here," made to a witness in circumstances which prompted the witness to give him assurances to the contrary. A few days before the will was made, during the night, he was observed to be wrapping papers about his feet and he explained that he was trying to put on boots. He placed a very peculiar interpretation upon the acts of the neighbors who were helping care for his sick wife. He indicated that he thought they were holding lodge meetings there. He referred to the women as wearing whiskers. He seemed to have erroneous impressions as to his wife being taken to the hospital; also, as to her identity. Shortly after the will was made he seemed to have an impression that one of his sisters who was in fact living was dead.

The evidence shows that prior to the last illness of Maggie and William Cain there had been very little communication between them and

Vera Helen Smith and Jay Brand, niece and nephew, respectively, of Maggie Cain and principal beneficiaries under the will; that they lived in Winnipeg and learned of the illness in the Cain home through a telephone message from the Ginns who were neighbors of the aged couple; that Thomas Ginn and William Cain were not on good terms; that when Mrs. Smith and Brand came to Crystal in response to the call they went first to the Ginn home and remained there for several hours before going to the Cain home and that, in accounting for their coming, they refrained from mentioning the telephone message and stated they had come because their failure to receive an answer to a letter had caused them to suspect that something might be wrong. At the suggestion of Maggie Cain, William Cain took Mrs. Smith and Brand to the hotel for dinner on the evening of their arrival, and their relations otherwise while there were not shown to have been out of the ordinary.

In the course of the opinion we will have occasion to refer to evidence of declarations made by the testator to the effect that he and his wife had a mutual understanding that the property of each should ultimately go to their respective blood relatives and to evidence of one witness with whom the testator had consulted regarding his property that Cain had said that he would just as soon his wife's relatives would have the property as his own; also, to further expert testimony on the effects of veronal.

The verdict in this case was one finding simply that Exhibit 1 was not the last will and testament of William Cain, deceased. In submitting the cause to the jury, the court outlined the issues and submitted for their consideration three questions, namely: (1) Was Exhibit 1 executed or made in accordance with the laws of North Dakota? (2) Was Mr. Cain at the time he made Exhibit 1 mentally competent or able to make a will and, if so, (3) Was the will he made the result of undue influence brought to bear on his mind so that the instrument does not express his will; or was there any fraud on the part of Mrs. Smith and Mr. Brand, or anyone acting for them, which voids this alleged will? The main question, as we see it on the record, is whether or not the deceased had capacity to make a will at the time the will in question was made. We shall therefore consider this question first.

Counsel for the appellants have submitted an exhaustive brief of some 260 pages covering both the facts and the law. In their review

of the facts they take up practically every incident in which the deceased had manifested peculiarities or hallucinations and they have been able to render an explanation showing that the acts relied upon to prove lack of capacity are not inconsistent with rational conduct or that they may be attributed to a sense of humor which the record shows was possessed by the deceased. While these incidents may be susceptible of the explanations made and the analysis in each case sustained, yet we must view the record in its entirety and determine whether the evidence as a whole may warrant an inference of failing mentality amounting to incapacity to make a will. Whether or not it is of sufficient probative force to sustain the burden of proving lack of capacity is, in our opinion, a matter of judgment to be formed and exercised upon the whole record.

The industry which counsel have devoted to this cause has resulted in their being able to submit for our consideration innumerable authorities bearing upon the questions in hand. They have collated decided cases from practically every jurisdiction and have gleaned from them many clear statements of the rules of law to be applied where such issues are involved, according to which the sufficiency of the evidence upon these issues is to be determined. We have examined many of these authorities and we approach a decision of this case amply warned against applying to the evidence a test of sufficiency that might result merely in giving effect to the judgment of the jury as to the disposition that the testator should have made of his property rather than the desire of a competent testator to dispose of his property in a particular manner. Many authorities are presented in which comment is made in substance that the upsetting of wills is a growing evil. (Re Carriger, 104 Cal. 81, 37 Pac. 785) and which show that in will contests, more than in any other class of cases, juries are wont to render verdicts upon insufficient evidence (Re Wilson, 117 Cal. 262, 49 Pac. 172, 711; Latham v. Udell, 38 Mich. 238; Re Wolf, 196 App. Div. 722, 188 N. Y. Supp. 438), resulting in many instances where such verdicts are set aside as not supported by a preponderance of evidence. We are warned upon so great an authority as Judge Cooley in Fraser v. Jennison, 42 Mich. 206, 3 N. W. 882, that the test of testamentary capacity is not the test of sanity; that mental disorder may exist and yet the disordered mind may nevertheless be capable

of meeting every test for the disposition of property by will.  As Judge Cooley says (page 232 [3 N. W. 900]):  "A man may believe himself to be the Supreme Ruler of the Universe, and nevertheless make a perfectly sensible disposition of his property, and the courts will sustain it when it appears that his mania did not dictate its provisions." We recognize the wisdom in the observations of these high authorities, but, after all, the problem confronting us upon this appeal is one that requires the exercise of judgment upon a state of facts appearing in the record, and, in the light of the tests referred to, of applying elementary rules of law.  As no two cases are alike and as only slight differences in facts may entirely account for wholly different results in cases that may be compared, it has seemed to us unprofitable to make any reference to adjudicated cases regarded as more or less in point with the one in hand.

There is a presumption of sanity and of testamentary capacity (Hedderich v. Hedderich, 18 N. D. 488, 123 N. W. 276; Edwardson v. Gerwien, 41 N. D. 506, 171 N. W. 101; Schmidt v. Schmidt, 47 Minn. 451, 50 N. W. 598; 1 Underhill, Wills, § 86), and when a will is contested on the ground of lack of capacity in the testator to make it the burden of proof is upon the contestants to establish such lack of capacity by competent evidence.  (Authorities, supra).  The principal argument upon this appeal is that the contestants have not sustained the burden of proof.

The capacity to execute a will has so often been defined as being the ability of the testator to know the extent and character of his property, to be mindful of the natural objects of his bounty and to appreciate the character of the act in which he is engaged that this simple test may be applied as elementary and without the citation of authority. The evidence in this case does not show directly any lack of ability on the part of the testator to comprehend the nature and extent of his property.  He talked with apparent rationality concerning it.  He mentioned different items and was even able to quote a certificate of deposit.  He knew the location of different articles such as certificates, money and jewels.  The record leaves open to question, however, whether at the time of making the will he knew he had within a few hours inherited from Maggie Cain the property which had been hers. He might have been able to comprehend the extent and character of

his property, including that which he had inherited from Maggie Cain, had he known of her death. It is apparent from the record that nothing took place in the presence of the subscribing witnesses that would tend strongly to show any lack of apparent ability on the part of the testator to comprehend the extent of his property, but his instincts, being somewhat miserly, might enable him to retain the ability to describe his property as to content and location even after he had lost the power to intelligently comprehend the nature and extent of it.

As to the natural objects of his bounty, there is considerable evidence going to show that prior to the making of the will in question there had been an understanding between the testator and his wife to the effect that ultimately her relatives should receive her property and his relatives, his property. Considering the way these people had lived and the fact that they had kept their property separate, the natural objects of his bounty under the circumstances embraced both his relatives and the relatives of Maggie Cain. In making the most substantial bequest to a niece of Maggie Cain, he of course recognized one of the natural objects of his bounty under the arrangement that had long existed, but did he have capacity to sufficiently comprehend the position of other relatives as naturally possessing claims upon his bounty? We will put aside the fact that no provision was made for his wife, which is readily explainable either on the theory that he knew she was dead,—though this is doubtful, that he knew she was on her death bed, or that she possessed ample property in her own right. The evidence shows that he had sisters for whom he entertained great affection. It further shows a sufficient acquaintance with two nephews who are sons of one of these sisters to enable him to form a judgment based upon reason adverse to making a bequest to either or both of them. It seems that at the time the will was drawn one purpose was dominant in the mind of Cain and that was to turn the property over to Mrs. Smith and leave it to her as to whether other relatives should receive anything. He was advised against pursuing this course by Thomson, the attorney, and, in consequence, Jay Brand, a cousin of the principal legatee, was given $1,000. Thomson asked as to remembering other relatives in Canada and Cain, according to Thomson's testimony, disclosed that Mrs. Black was still living and that there were other relatives in Canada, but he did not mention his sister Jane.

The testator stated that he did not feel under any obligation to them and that he would leave the giving to "Vera."

There is other testimony to the effect that within two days after the will was drawn he was talking about his sisters and thought one of them was dead; that one of his nephews talked with him and tried to explain that his sisters were both living, told him that he had a letter from one of them and the testator did not ask to have it read. This testimony, apart from the evidence otherwise bearing upon his general condition at the time, we think has a tendency to prove that at the time he made the will in question he was not capable of comprehending the natural objects of his bounty.

The testimony concerning the circumstances in which the will was made indicates that nothing took place in the presence of the subscribing witnesses which would tend strongly to show any lack of appreciation on the part of the testator as to the character of the act in which he was engaged. But we must look beyond these circumstances and give to the evidence bearing upon the real condition of the testator the effect to which it is entitled. If it is such as to reasonably warrant inferences contrary to the apparent state of facts with reference to capacity, as exhibited to the scrivener and to Dr. Stacy, both of whom acted as subscribing witnesses, it may support the burden resting upon the contestants.

There is ample evidence that just prior to the making of the will Cain had been failing rapidly; that he had become exceedingly forgetful and that his ability to form rational judgments concerning what was taking place around him had declined to a very great extent. Whether or not this condition was augmented by the drug that had been administered to permit some relaxation from the strain under which the testator had admittedly been laboring, was clearly a question for the jury. The facts concerning the administration of the drug, veronal, were before the jury and there is at least a conflict of medical testimony as to whether or not more than one dose should have been given (there is a question as to the number of doses given), and whether the hypnotic effect of the drug was cumulative and lasting. Dr. Glaspel testified that the usual dose is from five to ten grains for an adult in the prime of life; that for an aged, feeble person it would be less; that the drug is excreted from the system through the kidneys to the extent

of from 70 to 90 per cent; that the excretory powers of an aged person are less than those of a younger person; that the effects of an excessive dose would be sleep, coma and death; that the excretion is very slow, requiring from two to four days; that it has a cumulative effect if the doses are repeated; that the first effect of a dose is upon the mind and the nervous system and that it is destructive of the mind and destructive of the memory. All of the testimony relating to the incidents that took place in the Cain home during the last few days of the critical illness and up to the death of Maggie Cain indicates that the testator, already weak and failing, was under a great strain. It shows a lack of capacity to form rational judgments concerning some ordinary experiences in the prevailing circumstances and, we think, presents a question for the jury as to the degree to which his ability to comprehend a testamentary act was impaired. We are of the opinion that the evidence as a whole sustains the burden of proof which was upon the contestants and supports the verdict of the jury in their favor.

It is contended that, even though the evidence be regarded as sufficient to support the verdict of the jury in favor of the contestants upon the one issue of capacity, nevertheless it is not sufficient to support it on the remaining issues of execution and of fraud and undue influence and that therefore it was error to submit these questions to the jury in such form that they did not admit of separate answers. The appellants rely upon the rule that, where an issue is raised by the pleadings and no testimony is adduced concerning it which would support a verdict in favor of the party having the burden of proof, it is error to submit such issue to the jury. Where such an issue has been submitted along with other issues that are within the evidence and a general verdict rendered, it being impossible to say in the absence of a special finding upon what issue the jury based its verdict, the judgment cannot stand and a new trial must be ordered. McLeod v. Simon, 51 N. D. 533, 200 N. W. 790; 38 Cyc. 1612, 1623, 1624. Whether or not this rule is properly invoked depends upon the condition of the record as to the evidence. But we must first note the manner in which the issues were submitted.

Upon the subject of undue influence the court said:

"You have heard the evidence on this question, if you find there was any; and it is for you to say whether there is any evidence touching

on that question and it is for you to decide that question before arriving at your verdict in this case."

It was for the court, and not the jury, to say whether there was any evidence of undue influence. Rowan v. Hull, 55 W. Va. 335, 104 Am. St. Rep. 998, 47 S. E. 92, 2 Ann. Cas. 884.

In another portion of the charge the court, in outlining the issues to the jury, quoted verbatim the objections to the probate of the will, one paragraph so quoted being as follows:

"That said William Cain now deceased was an old man of weak and impaired mind and in a state of great physical feebleness when said pretended will was made, and the same was made shortly after the death of his wife and when he was suffering great grief on account of her sickness and in great mental agony as a result of his own sickness, and said will was made at the suggestion and because of the importunities of the said Vera Helen Smith and Jay Brand who for some days just before the making of said pretended will had schemed to ingratiate themselves into the confidence of the said William Cain and to induce him to disinherit his own heirs and give his property to the said Vera Helen Smith and Jay Brand who were strangers in blood, and then, together with others acting in concert with them, took advantage of his weakness of mind and body and his mental and physical helplessness and his suffering and grief and agony, and established a dominion over his mind, and by suggestion, solicitation and importunity and while he was in such weakened condition and when he was too feeble of mind to remember his own relatives and in ignorance of his wife's death and unaware of the true state and extent of his property and concealed from him by the said Vera Helen Smith and Jay Brand and others acting in privity with them, they destroyed his own intentions frequently expressed when he was of sound and disposing mind and induced him to make a pretended will which reflected the desires of the said Vera Helen Smith and Jay Brand and disinherited his own blood relatives and deprived them of a fair proportion of his property and of the property he had intended to give to his own blood relatives and gave practically the whole of his life long accumulations to the said Vera Helen Smith and Jay Brand; and the said pretended will was not the voluntary act of the said William Cain, now deceased, but the expression of the will of the said Vera Helen Smith

and Jay Brand brought about by the duress, undue influence and fraud of the said Vera Helen Smith and Jay Brand and others acting in concert with them as aforesaid."

At the conclusion of the above quotation the court informed the jury that the defendant had answered denying the charges and stated that the pleadings were not evidence, that they were simply the written claims of the parties on which the case was brought to trial.

The practice of reading pleadings to the jury is generally condemned. 1 Blashfield, Instructions to Juries, 2d ed. § 91. Pleadings are addressed to the court and not to the jury. Their primary function is to enlighten the court upon the issues involved in litigation. They may be couched in technical language, not suited to convey a clear meaning to the lay mind, or they may contain allegations of such ultimate or evidentiary facts as the pleader hopes to establish, and the language may be pregnant with sinister implications beyond the power of a mere denial to eradicate. It will be noted that in the quotation above reference is made to importunities of Vera Helen Smith and Jay Brand and to scheming to ingratiate themselves into the confidence of William Cain and to establishing dominion over his mind by suggestion, solicitation and importunity while he was in such a weakened condition and so enfeebled in mind as to be unable to remember his own relatives. If it be assumed that the evidence which was offered in this case to establish the circumstances out of which the will arose would warrant the jury in finding that it was the result of undue influence, it is nevertheless true that there is no evidence in the record of any solicitation, suggestion or importunity on the part of any of the beneficiaries. Conceding, for the purpose of this opinion, that the evidence does afford sufficient foundation for finding that undue influence was exercised, we are of the opinion that the manner in which the question was submitted militated against a fair consideration of the evidence by the jury. As we view the matter, it is fully as prejudicial to read from a pleading statements of purely evidentiary matter which there is little or no testimony to support as it would be to specifically call attention to testimony tending to support particular facts, or to emphasize them otherwise. If there were evidence of the specific facts alleged and recited, such evidence would, of course, warrant an inference of undue influence; but where this ultimate fact must be found

from the general circumstances, the attention of the jury should not be drawn to specific acts of the beneficiaries of a questionable character when there is no evidence of such conduct. It is difficult to see how a reading of such a pleading as that in question could serve any legitimate or useful purpose in the trial and how the jury could escape the impression, which must have been made by its reading, that the court was of the opinion that there was evidence in the record which would warrant the jury in finding each fact pleaded. Furthermore, it will be noted that the prejudicial effect of the pleading is augmented by its argumentative tone wherein it suggests disinheritance of blood relatives, the deprivation of a fair proportion of the property of the deceased which he had intended to give to his own blood relatives (notwithstanding the testimony of McBride as to an indifferent attitude as between his own and his wife's blood relatives) and as to its involving a disposition of his life-long accumulations. See Shebeck v. National Cracker Co. 120 Iowa, 414, 94 N. W. 930; Savino v. Griffin Wheel Co. 118 Minn. 290, 136 N. W. 876; Home Sav. Bank v. Stewart, 78 Neb. 624, 110 N. W. 947.

This court is not altogether agreed as to whether the evidence is sufficient in law to support a verdict for the contestants upon the issue of undue influence and fraud, considering the fraud in this connection wholly apart from any concealment there might have been of the fact of Maggie Cain's death; but we are agreed that the manner in which such issue was submitted for the consideration of the jury so far militated against a calm consideration of the evidence as to raise a strong probability against a fair trial of such issue.

As to the sufficiency of the evidence on this issue, a majority of the members of this court are agreed that it is sufficient in law. On account of the difficulty of establishing by direct evidence the communications and intimate contact between the deceased and the person alleged to have exercised undue influence in procuring the execution of a will, it is necessary generally to resort to circumstantial evidence, and where circumstantial evidence is relied upon, all of the circumstances having a bearing upon the question are proper subjects of inquiry. 1 Underhill, Wills, §§ 126 to 132, inclusive. In this case there is evidence that the principal legatees are strangers to the blood of the deceased, that up until a short time before the will was made they were likewise

strangers to both his acquaintance and the acquaintance of Maggie Cain, their aunt. There had been very little communication between them. There was little or no intimacy between the deceased and Maggie Cain on the one hand and these relatives of the latter until a few days before the death of Maggie Cain and a few weeks before the death of the testator. When they came from Winnipeg in response to a call they did not go directly to the house, nor did they give a truthful account of the reason for their coming. They were the only relatives of either of the Cains to be present. They were remembered in the will. The will does not express the testamentary desires of the Cains as declared before this will was made. Then there is abundant evidence of the weakened mentality of the testator; also, that the subject of the disposition of the property was discussed between the principal legatee and the testator at a time when the latter was in great distress of mind owing to the critical illness of his aged spouse and that the will was made as a result of the agency of this legatee in calling in an attorney. At or near the time when he is shown to have first spoken of his desire to send for an attorney to fix up his affairs, he was taking, or probably under the influence of, opiates. The legatee Brand and others present before the will was made and before the attorney saw the testator understood that a will was to be made in favor of him and Vera Helen Smith, the residuary and principal legatee. There is some question as to whether they did not refrain from notifying the testator of the death of his wife until after the will was made. We think such evidence affords a circumstantial basis for a finding by the jury that the will was the result of undue influence. We do not say that the jury might not have been amply warranted in taking a view of the evidence favorable to the proponents. There is considerable conflict in the testimony and many of the incidents having a bearing upon the question of undue influence, as well as upon that of lack of capacity, are readily susceptible of an explanation which if accepted by the jury would largely destroy the effect of the evidence as proof. But it is for the jury to resolve conflicts and it is likewise for them to consider the reasonableness and completeness of the explanations.

On the question of fraud in connection with the alleged concealment from Cain of the fact that Maggie Cain had died, the members of the court are divided in opinion as to the effect of such fraud if any.

We are agreed, however, that the evidence presents a question of fact for the jury as to whether or not at the time the will was made the testator knew that Maggie Cain was dead. On this subject the court instructed the jury in part as follows:

"If you find that Mr. Cain's will was drawn at a time when he was physically and mentally weak, and that he was unaware of his wife's death, and it was not explained to him and brought home to his mind that the effect of the will was to devise all of his wife's property, as well as his own property, then the effect of such concealment is a fact and circumstance to be considered as to whether or not this amounted to fraud on the part of those who prepared the will, and on the part of those who were present and took benefit under the will.

"The law is that actual fraud is committed by the suppression of knowledge of that which is true by one having knowledge, or belief, of the facts, or by one with his or her connivance with intent to deceive another or to induce him to make his will; so if you find that Mrs. Smith and Mr. Brand suppressed from Mr. Cain the knowledge that his wife was dead at the time he made the alleged will, or that others suppressed knowledge of that fact with the connivance of Mrs. Smith and Mr. Brand with the intent to deceive Mr. Cain and induce him to make his will otherwise than he would have done with such knowledge of death, then there was actual fraud perpetrated on Mr. Cain and the will would be null and void."

The court required the contestants to establish "by a fair preponderance of the evidence: First, that deception was practiced upon the testator, that is, that he did not know of the death of his wife, and second, that such fact was intentionally concealed from him." It further charged that if Cain, acting in ignorance of the death of his wife, failed to provide for her in his will, that fact might be considered on the question of testamentary capacity, since his wife was one of the natural objects of his bounty, but that if his failure to make such provision was due to a belief on his part that she had ample means to provide for her during the rest of her life, then the fact of his failure to make provision in the will should not be considered on the question of testamentary capacity, "but such belief would not avoid the effect of any fraud practiced on Mr. Cain in the suppression of the fact of his wife's death—if the jury find that he did not know of her death at the

time of making the will and that such fact of death was intentionally concealed from him to induce him to make his will as he did."

It will be seen that this issue of fraud, as it was submitted, is concerned with the concealment of the fact of Mrs. Cain's death. We do not agree with the appellants' contention that a concealment of the fact of the death of Maggie Cain without wrongful intent and with a good motive could not affect the validity of the will as applied to those participating in the concealment.

"It is enough, . . ." says Kerr on Fraud & Mistake, page 27, "that it (the representation) be made wilfully and with the view to induce another to act upon it, who does so accordingly to his prejudice. The law imputes to him a fraudulent intent, although he may not have been in fact instigated by a morally bad motive. An intention to deceive, or a fraudulent intent in the legal acceptation of the term, depends upon the knowledge or belief respecting the falsehood of the statement, and not upon the actual dishonesty of purpose in making the statement. . . .

"The motive as distinguished from the intention is immaterial. Although there might be no intention on the part of the defendant to obtain an advantage for himself, it would still be a fraud, for which he was responsible in law, if he made representations productive of loss to another, knowing such representations to be false. It is a fraud in law if a party makes representations which he knows to be false and injury ensues, although the motive from which the representations proceeded may not have been bad."

If there was concealment in the instant case, it was intentional, though probably with a good motive. But there is nothing to show that the will contains any provisions that would not have been present had it been made while the fact was known. Indeed, it would seem that the testator, while the making of the will was progressing, was aware that he was disposing of property owned by Maggie Cain, as the diamonds, or jewelry, were mentioned. There is little, if anything, in the record to indicate that the concealment, if present, was practiced for the purpose of inducing the will to be made other than it would have been made had the fact concealed been known. The strongest inference reasonably deducible is that that fact was not brought to Cain's attention at the time because of a fear that in his weakened condition

it might have had such an effect upon him as to render him altogether unable or disinclined to proceed with the settlement of his affairs according to the intention that he had expressed earlier in the morning and before his wife had died. The fact that he proceeded to make a will devising and bequeathing his own property to his wife's relatives, assuming testamentary capacity, shows that he desired his own property to go to them. This desire and this disposition, so far as it affects the property which he had long owned, is necessarily unaffected by the fact concealed. In other words, the effect of any fraud resulting from an innocent concealment of the fact of Maggie Cain's death would, in the view of a majority of this court under the facts in this case, extend no further than to render void the will in so far as it would operate upon the property which the deceased had inherited from his wife almost immediately before the making of the will. A majority of the court is agreed that it was error to submit the question of fraud to the jury in such a manner as to warrant the setting aside of the will altogether on that account, and that at most it could have had but the limited effect indicated. See Schouler, Wills, §§ 224 and 238; 1 Page, Wills, 2d ed. § 184; 40 Cyc. 1149; Re Carson, 184 Cal. 437, 17 A.L.R. 239, 194 Pac. 5; Taylor v. Kelly, 31 Ala. 59, 68 Am. Dec. 150; Smith v. Diggs, 128 Md. 394, 97 Atl. 712, 130 Md. 101, 99 Atl. 952. However, it is not to be assumed, on a retrial of the case under substantially similar testimony, that this question should be submitted as a part of any instruction for a general verdict, but it is suggested that upon a retrial any question concerning concealment of the fact indicated be separately submitted. Neither is it to be assumed that what is said in this opinion with reference to the effect of any failure on the part of the legatees, even with a good motive, to communicate to the testator the fact of his wife's death, is intended to minimize the evidentiary value of such concealment upon the question of undue influence; that is, it may still be considered a circumstance along with other circumstances having a tendency to show that the will in question is the result of the predominating influence of others and speaks their desires rather than the intention of the testator.

We are also of the opinion that under the undisputed evidence the only real issue that existed with reference to the execution of the will was involved in the issue of capacity and that the question of execution

should not have been submitted as a wholly separate question. We realize that in the instruction given the verdict, if it should be based upon this issue, was made to depend upon what the deceased had knowingly and understandingly done or permitted to be done or declared in his presence; and, being thus linked with the question of capacity, we would hesitate to reverse on this ground alone. But in view of another trial we think that, upon the same evidence, this question should not be submitted as a distinct issue warranting a general verdict in favor of the contestants and that any fact connected with the execution upon which either the court or the parties may desire a finding by the jury might well be submitted in the form of a special interrogatory unless the court should desire to submit the whole matter for a special verdict.

As previously stated, the principal issue in this case is the mental capacity of the testator and on this question we are of the opinion that the record presents evidence which would support a verdict for either party. While a majority is also of the opinion that all the circumstances in connection with the making of the will might likewise warrant the jury in finding the will to have been the result of undue influence on the part of the principal beneficiaries, Vera Helen Smith and Jay Brand, we think that upon a retrial of the case, under similar evidence, such question might well be submitted in the form of a special interrogatory.

The order appealed from is reversed and a new trial granted.

BURKE, Ch. J., and NUESSLE, BURR, and CHRISTIANSON, JJ., concur.